# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SOFAER GLOBAL HEDGE FUND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-1191-TWP-DML |
| | ) | |
| BRIGHTPOINT, INC., and ROBERT J. LAIKIN, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants Brightpoint, Inc. ("Brightpoint") and Robert Laikin's ("Mr. Laikin") (collectively, "Defendants"), Motion for Summary Judgment. Plaintiff Sofaer Global Hedge Fund's ("Sofaer") allegations stem from a single phone conversation in which Mr. Laikin, Brightpoint's CEO, stated that a deal was "99.9% done," when, in reality, the deal was in its infancy. Based on Mr. Laikin's statements, Sofaer made a $10 million loan ("the Loan") to non-party Chinatron Group Holdings, Limited ("Chinatron"). Unfortunately, the "99.9% done" deal never came to fruition. Now, Sofaer has sued Defendants for actual fraud, constructive fraud, and promissory estoppel. The Court is aware that there are two sides to every story, including this one. But even under Sofaer's version, summary judgment is warranted. Defendants' Motion (Dkt. 106) is **GRANTED**.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d

487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## II. BACKGROUND

### A. Relevant Entities and Persons

There are eight notable players in this dispute. First, Brightpoint, an Indiana corporation, is one of the world's largest distributors of mobile telephones. Second, Mr. Laikin is Brightpoint's founder and CEO. Third, Sofaer, which made the Loan at issue, is an international hedge fund. Fourth, Sofaer is headed by Michael Sofaer ("Mr. Sofaer"). Fifth, Chinatron, a limited liability company incorporated in Hong Kong that invests in telecommunications, was the recipient of Sofaer's Loan. Sixth, John Maclean-Arnott ("Mr. Arnott") founded Chinatron in 1999 and was its managing director and CEO at the time of the Loan. Seventh and Eighth,

Mobiltron Europe SAS ("Mobiltron France") was, at the time of the Loan, a wholly-owned subsidiary of Chinatron through another entity called Mobiltron Group ("Mobiltron Group"). Mr. Arnott is also the founder of Mobiltron Group.

**B.      Business Dealings between Mr. Laikin and Mr. Arnott**

Mr. Laikin and Mr. Arnott have done business together for years. Relevant to this dispute, in December 2006, Brightpoint approved a line of credit for Mobiltron Group, allowing it to purchase $5 million worth of products from Brightpoint on a given day, with payment due four days later. Prior to this arrangement, Mobiltron Group always purchased Brightpoint products by paying cash in advance. In early 2007, Mobiltron Group began to encounter financial woes and, in late spring/early summer 2007, became delinquent on its payables to Brightpoint and other creditors. Between July 10, 2007 and the end of 2007, Mobiltron Group's debt to Brightpoint fluctuated between $5.4 million and $7 million. Brightpoint worked with Mobiltron Group to structure a repayment plan. Unfortunately, Mobiltron Group was unable to comply with any of the proposed plans.

**C.      Mr. Arnott solicits Mr. Sofaer to Raise Money**

As a way of raising money and paying down Mobiltron Group's debt to Brightpoint and others, Mr. Arnott broached the idea of selling Mobiltron France to Brightpoint. In a November 23, 2007 email to Mr. Laikin, Mr. Arnott described Mobiltron France as "a super clean and profitable company with 25% growth in the bag for next year. It requires little management time and has the best manager possible. They are totally self sufficient. Next year they will make US$1 million net at least." Mr. Arnott testified that, prior to December 2007, the discussions regarding Brightpoint's potential acquisition of Mobiltron France were "strategic." When asked

if these discussions were "serious," Mr. Arnott testified, "I would say depending on how you define 'serious'…". (Arnott Dep. 15:3-8).

In late 2007, in light of Mobiltron Group's financial difficulties, Mr. Arnott attempted to raise capital from his own investors. But these efforts faltered, so Mr. Arnott sought "outside investors to seek additional funding." (Arnott Dep. 53:1-9). Specifically, on December 13 or 14, 2007, Mr. Arnott contacted Mr. Sofaer and asked him to loan $10 million to Chinatron. Mr. Arnott told Mr. Sofaer that "the loan would be repaid by means of an asset belonging to Chinatron…Mobiltron France being sold to Brightpoint for $14 million." (Sofaer 30(b)(6) Dep. 17:14-20). In response, Mr. Sofaer asked Mr. Arnott to arrange a telephone conference call among himself, Mr. Arnott, and Mr. Laikin. Prior to this call, Mr. Sofaer had never communicated with Mr. Laikin and had no relationship with Brightpoint.

**D.     The December 17, 2007 Telephone Call**

On December 17, 2007, Mr. Arnott, Mr. Laikin, and Mr. Sofaer participated in a conference call, in which Mr. Laikin allegedly promised to buy Mobiltron France by the end of March 2008. During his deposition, Mr. Sofaer testified that "my words were initially to ask Robert Laikin to give me assurances that he would on behalf of Brightpoint buy Mobiltron France from Chinatron by March 2008 in order that the loan that I was contemplating on behalf of Global Hedge Fund to Chinatron be repaid." (Sofaer 30(b)(6) Dep. 26:1-7). Further, Mr. Sofaer testified that Mr. Laikin told him that "<u>he intended that Brightpoint should buy Mobiltron France for $14 million; that it was 99.9% done; that he could get it done without a problem and that it's going to happen</u>." (Sofaer 30(b)(6) Dep. 35:8-14; emphasis added). On this point, Mr. Arnott testified that Mr. Laikin stated that "it was a relatively small deal by Brightpoint

4

standards, and that he could make it happen." (Arnott Dep. 346:19-21).  These statements are, in essence, the bedrock of the present dispute.

However, even if the broad contours of the deal were shaped at this time, Brightpoint never entered into any agreement that was "boiled down to writing." (Arnott Dep. 134:13-16). In fact, during the telephone call, Mr. Sofaer asked Mr. Laikin to put his assurances in writing, but Mr. Laikin declined.  Mr. Laikin did, however, assure Mr. Sofaer that "his word was his bond." (Arnott Dep. 357:20-358:3).  The phone call ended after less than 30 minutes.  No recordings, notes, or summaries of that conversation have been produced.

The December 17, 2007 discussion was relatively light on details.  For instance, none of the following was discussed: (1) whether the transaction "would be an asset or stock sale," (2) whether it would involve "post-closing working capital adjustments," (3) "employee retention," (4) "tax issues," (5) "amounts that Chinatron owed Brightpoint," or (6) "intercompany transfer issues." (Sofaer 30(b)(6) Dep. 290:6-291:9).  Mr. Sofaer further testified that during the December 17th call, "[t]here was no mention of Brightpoint having made an offer" to purchase Mobiltron France. (Sofaer 30(b)(6) Dep. 37:1-6).  Additionally, "as of December 17, 2007," Sofaer "didn't know one way or the other" whether "Brightpoint had sent a letter of intent to Mobiltron or Chinatron." (Sofaer 30(b)(6) Dep. 38:10-17).  Finally, "there was no discussion of any due diligence" during the call. (Sofaer 30(b)(6) Dep. 294:4-5).

**E.  Sofaer Loans Chinatron $10 million**

On December 18, 2007 – one day after the call – Mr. Arnott sent Mr. Laikin the following email: "Sofaer is worrying you get hit by a bus then what?  He is asking me what guarantees I can give him.  He wants a personal guarantee from me as he has highest respect for

me and knows I am straight." Three days later, on December 21, 2007, Chinatron's counsel sent Mr. Sofaer an email seeking to quell any lingering anxiety about the Loan. In relevant part, it stated:

> [T]o obtain further comfort regarding non-completion of this buy-out, I have prepared a Personal Guarantee to be given by [Mr. Arnott]....Not only should this ...provide you with the comfort you are seeking but its significance will be further heightened by the fact that [Mr. Laikin] of Brightpoint is or will be aware of the giving of this Guarantee by [Mr. Arnott]. This will give yet further resolve to [Mr. Laikin's] commitment regarding the buy-out!"

On December 24, 2007, without conducting any due diligence, Sofaer executed a 12-page agreement for a $10 million loan to Chinatron (the "Loan Agreement"). Pursuant to the Loan Agreement, Chinatron agreed to repay the $10 million Loan plus a $2 million premium three months later – by March 31, 2008.[1] Moreover, the Loan Agreement contemplated a "Participating Bonus" for Sofaer, "in the event that the entire issued share capital of [Mobiltron France]...is sold prior to 31 March 2008 for a consideration in excess of USD 12,000,000...". So, if Chinatron sold Mobiltron France before March 31, 2008 for more than $12 million, Chinatron was obligated to pay Sofaer "50% of such excess."

Other provisions of the Loan Agreement are worth noting. For instance, Section 8.2.2 of the Loan Agreement granted Sofaer the right to veto the sale of any asset of Chinatron, including Mobiltron France. Further, Section 8.1.1 stated that Chinatron "covenants and undertakes...to secure a sale of [Mobiltron France] on or before the Repayment Date....". Finally, the Loan Agreement contained clauses addressing representations and warranties, events of default, and conditions precedent. References to Brightpoint, however, were absent from the Loan Agreement.

---

[1] This premium alone – not counting the "Participating Bonus" – equates to an annualized rate of return of roughly 80%.

That same day, Mr. Arnott executed a personal guarantee, pursuant to which he "irrevocably and unconditionally guarantee[d] the due, punctual and complete performance by Chinatron…of all its obligations, covenants and undertakings…as if [he] were the primary obligor thereof."  Like the Loan Agreement, the personal guarantee made no mention of Brightpoint.  On January 2, 2008, Chinatron received $10 million and immediately paid Brightpoint $5.4 million that it owed from the prior line of credit.  Chinatron used the remaining $4.6 million as "working capital."

**F.      Brightpoint Offers to buy Mobiltron France**

On January 14 and 15, 2008, Brightpoint executed Non-Disclosure and Confidentiality Agreements with Mobiltron and began undertaking due diligence with regard to Mobiltron France.  On January 28, 2008, Mr. Laikin sent an email to Michael Koehn Milland, then-President of Brightpoint International, advising him that Brightstar, one of Brightpoint's competitors, was also trying to buy Mobiltron France, but boasted "[w]e get first shot at it."

In the first quarter of 2008, Brightpoint reviewed Mobiltron France's financials and visited its facility.  On or around March 17, 2008, Brightpoint offered to purchase 95% of Mobiltron France for $5 million.  Mr. Arnott immediately rejected this offer and then countered for far less than the $14 million previously discussed.  In an email written that same day, Mr. Arnott wrote:

> Pursuant to our discussions I am very disappointed with your offer of US$5 million for 95% of our Mobiltron France business.  This is far short of our internal valuation.  I would have thought US$7.5 million for 90% of the business would be more realistic.  Why don't you consider splitting the difference and looking at US$6.25 [million] for 92.5%?

The next day, on March 18, 2008, Brightpoint upped its bid, but Mr. Arnott did not immediately respond.  In the meantime, on March 20, 2008, Mr. Sofaer emailed Mr. Arnott, stating "I am wondering how close you are to securing agreement and payment from Brightpoint.  I do hope that amid the turmoil in the markets, you will be able to close your deal."  Mr. Arnott responded that he was "back and forth with Brightpoint who are also in checks and balances stage with getting our deal closed."  Mr. Arnott also asked Mr. Sofaer to "get one of [his] internal valuation experts to look at the numbers and model them so [Arnott could] have a sense check on final valuations from [Brightpoint]."

As Chinatron's deadline for repayment drew near, tensions mounted.  On March 30, 2008 – the day before Chinatron's repayments came due – Mr. Arnott advised Mr. Laikin he was "in a very uncomfortable position now with Sofaer" and admonished him to "remember that you said your word is your bond."  Mr. Laikin responded:

> I told you from day 1 that I would try to get my guys in Europe to get you an offer and buy [Mobiltron France].  My guys like the company.  They made an offer.  If you want to sell it to them based on their offer, let me know.  If you have a firm counter, please send it to me.  They might walk or they might [go] a small bit higher.  Our flexibility to pay higher went down as our [price-earnings ratio] went from 17 to 8.  With a [price-earnings ratio] of 8, our buy price goes to 5-6….And your partners need to know that you borrowed $10M USD from [Sofaer] and paid [Brightpoint] $5M USD.  That again begs the question, where did the other $5M USD go? I never offered to blindly offer you $10M USD for [Mobiltron France] and to suggest that is ridiculous.  That all being said, I have kept my word to you to get an offer.  Save everyone the time and either counter our offer or tell us let's move forward on our offer to close….

This back-and-forth continued on March 31, 2008, but the parties remained at an impasse.

**G.      Chinatron Defaults; Sofaer takes over Mobiltron France; this Lawsuit Ensues**

On March 31, 2008, Chinatron failed to repay Sofaer, thus defaulting on the Loan.  As a result, Sofaer was authorized to collect the debt under Mr. Arnott's personal guarantee.  Moreover, Mr. Sofaer testified that, as a result of the default, Sofaer "had the ability to close and take over Mobiltron."  (Sofaer 30(b)(6) Dep. 200:23-201:10).  On December 5, 2008, Sofaer's counsel sent an email to Mr. Arnott advising him that he would be sued if he did not pay the $12 million owed under the Loan Agreement.  On December 6, 2008, Mr. Sofaer emailed Mr. Arnott discussing the possibility of a claim against Mr. Laikin and Brightpoint, stating "it is not straightforward" and "[m]uch rests on whether we can show that Laikin said that Brightpoint would buy [Mobiltron France] for $12-$14m and that he either lied about that or was negligent." From there, Mr. Sofaer asked Mr. Arnott point-blank, "Did [Mr. Laikin] say that he would buy subject to [due diligence].  I don't recall that but did he say it to you…?"  Finally, Mr. Sofaer asked Mr. Arnott to compile various communications, stating "[t]hey can file a claim next week only if you can get your stuff together."  Mr. Arnott assured Mr. Sofaer that "[o]ur collation of data is ongoing and we will be ready."

Since then, Sofaer has never sought repayment from Mr. Arnott, despite the personal guarantee.  On this point, Mr. Sofaer testified that he has not pursued legal proceedings because Mr. Arnott does not have assets sufficient to make such efforts worthwhile.  Mr. Arnott confirmed this, testifying that he could not afford to repay the amount.  Mr. Arnott further testified that Sofaer is still holding the personal guarantee and could still sue him.

On July 24, 2008, Sofaer entered into a Supplemental Loan Agreement and a Charge Over Shares document, pursuant to which Sofaer obtained a security interest in the company that owned 100% of Mobiltron France.  Subsequently, in January 2009, Sofaer formally "took

control" of Mobiltron France. (Sofaer 30(b)(6) Dep. 251:5-7).[2]  During the spring and summer

of 2009, Brightpoint continued to make offers for Mobiltron France, even after Sofaer took

ownership.  Each was rejected and negotiations apparently unraveled, thus paving the way for

the present lawsuit.  On September 24, 2009, Sofaer sued Brightpoint and Mr. Laikin in this

Court.  Additional facts are added below as needed.

### III. <u>DISCUSSION</u>

As discussed Sofaer has brought three claims against Brightpoint and Mr. Laikin: (1)

actual fraud, (2) constructive fraud, and (3) promissory estoppel.  Each is addressed in turn

below.

### A.    Actual Fraud

To defeat Defendants' summary judgment motion on the actual fraud claim, Sofaer must

raise a material issue of fact concerning: "(1) a material misrepresentation of past or existing

facts; (2) made with knowledge or reckless ignorance of falsity; and (3) which caused the

[plaintiff] to rely upon the misrepresentation to [its] detriment." *Reginald Martin Agency, Inc. v.*

*Conseco Medical Ins. Co.*, 478 F. Supp. 2d 1076, 1089 (S.D. Ind. 2007) (citation omitted).

Sofaer's actual fraud claim fails for two reasons.  First, Mr. Laikin's alleged misrepresentation

referred to and related to future events and, second, Sofaer did not *reasonably* rely on Mr.

Laikin's misrepresentation.

### 1.    Mr. Laikin's statement was about future events

Under Indiana law, a viable fraud claim requires a material misrepresentation relating to a

"past or existing" fact susceptible to "'exact knowledge' at the time the statement is made."

---

[2] Defendants surmise that Sofaer obviously accepted Mobiltron France in satisfaction of the Loan.  Sofaer denies this.  Given the Court's ruling, it need not address this issue head-on.  However, it is worth noting that in Sofaer's responses to Defendants' First Interrogatories, Sofaer conceded that it "now owns Mobiltron France, as a partial remedy for Chinatron's failure to repay the loan…". (Dkt. 122-2 at 5).

*Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1410-11 (7th Cir. 1986). Statements of opinion, intent, or promises of future conduct do not amount to past or existing facts. *Biberstine v. New York Blower Co.*, 625 N.E.2d 1308, 1315 (Ind. Ct. App.1993); *see also Siegel v. Williams*, 818 N.E.2d 510, 515 (Ind. Ct. App. 2004) ("actual fraud may not be predicated upon representations of future conduct."). In other words, "promises and representations as to the future should be regarded merely as statements of opinion, hope or expectation upon which a party has no legal right to rely; that such statements as to a future event cannot by their very nature be false when made." *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 878 (Ind. Ct. App. 1983).

Sofaer attempts to stave off summary judgment by arguing that Mr. Laikin lied about an *existing* fact relating to the Brightpoint/Mobiltron France deal. That is, during the December 17, 2007 telephone call, Mr. Laikin falsely claimed that the deal was "99.9% done," even though it was only in a preliminary posture. This misrepresentation, according to Sofaer, relates to an existing fact because it involves the *then-existing status* of Brightpoint's acquisition of Mobiltron France. Although this argument is cogent and well-crafted, the Court is not persuaded.

First, while Sofaer couches Mr. Laikin's statement in present terms, it is inescapably a statement about the future. On this point, well-reasoned cases from other jurisdictions involving similar types of statements are instructive. *See, e.g., 5636 Alpha Road v. NCNB Tex. Nat'l Bank*, 879 F. Supp. 655, 665 (N.D. Tex. 1995) (bank officer's assurance that loan was a "done deal" referred to future performance and therefore was not actionable under circumstances); *Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00-Civ-572(JGK), 2003 WL 135706, at *2 (S.D.N.Y. Jan. 17, 2003) (statements by CEO to employee assuring her that situation would improve, that it would be worth her while to stay, that IPO was a "sure thing" and a "done deal," and that

employee would make a lot of money on IPO related only to future events, and thus did not constitute material false representation of existing fact).

These cases reinforce the Court's view that, at its core, Mr. Laikin's statement was nothing more than an assessment of the *likelihood* that the deal would go through *in the future*. Given that Mr. Laikin's representation was inextricably tied to the probability of a future event, it does not constitute an actionable misrepresentation. *See Vaughn*, 797 F.2d at 1415 (quoting Illinois case but applying Indiana law; "[a] statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities . . . ordinarily does not constitute an actionable misrepresentation."). Stated differently, although the phrase "99.9% done" is framed in present terms, it was really just Mr. Laikin's *opinion* about future events. *See Pugh's IGA, Inc. v. Super Food Services, Inc.*, 531 N.E.2d 1194, 1198 (Ind. Ct. App. 1988) (seller's projections of future financial performance were statements of opinion, which are "not actionable and the court should refuse to submit such statements to the jury").

By emphasizing the then-existing *status* of the deal, Sofaer is merely inviting the Court to elevate semantic form over actual substance. And, as a practical matter, the question arises: Why would Mr. Sofaer care about what percentage of terms had been hammered out as of December 17, 2007? After all, a transaction is inherently binary: either it's completed or it's not. A deal that is 99.9% done is worth no more than a deal that is 2% done, and both can be scuttled at the last-second by myriad intervening, and often unpredictable, events. Further, it is worth noting that the phrase "99.9% done" is relatively amorphous. Even taken literally, it could mean different things: for instance, that Mr. Laikin was 99.9% likely to pursue the deal; that Mr. Laikin was 99.9% sure that the deal would ultimately be completed; or, less realistically under the circumstances, that 999 out of 1,000 terms of the deal had been finalized. Even under the

most literal reading of the phrase, however, the door is left open to the possibility that the deal would not be completed.[3]

Finally, the Court's decision is strengthened by the fact that Sofaer knew that the deal was not actually 99.9% completed as of December 17, 2007. Rather, the credible evidence shows that, at the time of the phone call, all stakeholders knew that plenty of work remained on Brightpoint's prospective acquisition of Mobiltron France. This point is illustrated by the terms of the Loan Agreement entered into between Sofaer and Chinatron after the phone call. Tellingly, the Loan Agreement provided that *if* Chinatron sold Mobiltron France for more than $12 million before March 31, 2008, Sofaer would receive "50% of the excess." Additionally, Section 8.2.2 granted Sofaer the right to veto the sale of any asset of Chinatron, including Mobiltron France, and Section 8.1.1 required Chinatron to undertake efforts to secure the sale of Mobiltron France by March 31, 2008. Further, in his deposition, Mr. Sofaer testified that the proposed purchase price of $14 million "was based on a multiple of earnings that…Mobiltron France had achieved in the previous year or the latest year." (Sofaer 30(b)(6) Dep. 180:12-19). However, Mobiltron France's full 2007 earnings – a variable affecting price – could not have been available at the time of the December 17, 2007 call.[4] Thus, Sofaer had to know that, at the

_____

[3] Defendants also argue that to the extent Mr. Laikin made a misrepresentation about an existing fact, that misrepresentation was not a *material* fact. On this point, Mr. Sofaer testified as follows:

> The underlined material terms, as far as I was concerned, and [Sofaer] was…concerned, was that Robert Laikin underlined would procure and ensure that Brightpoint underlined would purchase Mobiltron France for $14 million underlined by the end of March 2008 and by so doing, underlined would ensure that Chinatron had the resources to repay the loan extended by [Sofaer]…. What was material to [Sofaer] was that this should be done. It was not.

(Sofaer 30(b)(6) Dep. 289:12-290:5) (emphasis added). According to Defendants, this statement establishes that the alleged material representations all related to whether the deal would actually go through *in the future*, not the *present status* of the deal. Sofaer argues that this statement is not dispositive, as it also relied on the *then-existing status* of the deal. This issue is academic, given the nature of the Court's ruling.

[4] On a few occasions, Mr. Sofaer walked back the testimony. He testified that "Mr. Laikin agreed to buy Mobiltron France by the end of March 2008 for $14 million, without any caveats." (Sofaer Dep. 294:7-9). But even if the

time of the Loan, the sale of Mobiltron France to Brightpoint was not a signed and sealed foregone conclusion.

In support of its argument, Sofaer relies heavily on *Reginald Martin Agency*, 478 F. Supp. 2d 1076.  In that case, the district court allowed a fraud claim to proceed where the defendant falsely represented that it was being sold as a way of managing the company toward continuing profitability when, in reality, it was hemorrhaging millions of dollars and was being disposed of as part of an overall debt reduction plan. *Id*. at 1090.  However, *Reginald* is distinguishable, given that the alleged fraudulent statement was susceptible to "exact knowledge."  Here, by contrast, whether Brightpoint would acquire Mobiltron France was not susceptible to "exact knowledge" at the time Mr. Laikin's statement was made.  To the contrary, the evidence shows that, in effect, Mr. Laikin's statement was one of intent or opinion referring to a promise to be performed in the future. *See Vaughn*, 797 F.2d at 1413 ("the real gravamen of the Vaughns' case is not that they were affirmatively misled by the appellants' misstatement of material facts…[r]ather, they are unhappy with the degree of success which they achieved.").  Similar to the reasoning employed in *Vaughn*, the real gravamen of Sofaer's claim is not its unhappiness with the actual status of the deal as of December 17, 2007; rather, Sofaer's quarrel is with the fact that the deal did not go through *after* the phone call.  At bottom, because an Indiana fraud claim "cannot be predicated upon matters of futurity or promises to be performed at some later time," *Braun*, 443 N.E.2d at 877, summary judgment is appropriate.

---

Court ignored Mr. Sofaer's more specific testimony regarding the significance of Mobiltron France's full 2007 earnings, none of its conclusion would change.  Moreover, "a genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Vantage Marketing, Inc. v. De Amertek Corp., Inc.*, 31 Fed. Appx. 109, 115 (4th Cir. 2002) (citation and internal quotations omitted).

## 2. Sofaer did not reasonably rely on Mr. Laikin's statement

A viable fraud claim also requires the plaintiff to prove that it had a *right* to act in reliance on the defendant's representation. *Vaughn* 797 F.2d at 1415 (applying Indiana law; "the *fact* of reliance is different from the *right* of reliance…[t]hus, to state a cause of action for fraud, a party must prove not only that he acted in reliance but also that he had the right to do so…"). Although generally a question of fact, right to reliance can be determined as a matter of law: "Where the evidence is so clear as to be susceptible of only one reasonable inference, it is for the court to determine as a matter of law whether plaintiff was justified in relying on the representation and whether he was negligent in doing so." *Id.* (quoting 37 C.J.S. *Fraud* § 129, at 455-56 (1955); determining that plaintiffs had no *right* to rely on representations, even if they did in *fact* rely on them).

Moreover, although courts "will not ignore an intentional fraud practiced on the unwary, [they] will, in most cases, require the exercise of reasonable prudence in business transactions by professionals who are dealing at arm's length." *Plymale v. Upright*, 419 N.E.2d 756, 768 (Ind. Ct. App. 1981). Reasonable prudence is determined by multiple factors, including: (1) "the form of the representations"; (2) "their materiality"; (3) the "relation of the parties"; (4) the "respective knowledge and means of knowledge of the parties"; (5) "the party to whom the representations were made"; and (6) "the respective character, intelligence, experience, age, and mental and physical condition of the parties." *Id.* at 761 n.4.

Here, the factors overwhelmingly weigh against a finding of reasonableness. First, all credible evidence indicates that Sofaer knew the deal was incomplete. Second, all representations took place during the course of a brief phone call that was scant on details. Third, prior to the call, Sofaer and Brightpoint had no relationship whatsoever. Fourth, Sofaer

had the resources and acumen to ascertain the true status of a Brightpoint/Mobiltron France deal, but instead failed to make commonsense inquiries about negotiations, due diligence, and any remaining contingencies that could thwart the deal. Finally, Sofaer – an international hedge fund – is the paradigmatic sophisticated entity, not an uneducated or vulnerable individual. Sofaer simply had to understand that there was some risk that the deal would fall apart.

Apparently, though, Sofaer was blinded by rose-colored glasses, believing that a deal in its infancy was actually carved in stone. But if the deal was "99.9% done" as of December 17, 2007, this begs the question: Why would it possibly take until March 31, 2008 to complete the deal? Simply stated, Sofaer's unduly optimistic behavior was not reasonably prudent and, to the extent Sofaer relied on Mr. Laikin's "99.9% done" statement, such reliance was unreasonable. After all, if this course of action were reasonable, sophisticated entities would be well advised to shield their eyes from facts and ignore the obvious questions, only to claim reliance and sue later. *See Urschel Farms, Inc. v. DeKalb Swine Breeders, Inc.*, 858 F. Supp. 831, 840 (N.D. Ind. 1994).

On this point, *Urschel* is instructive. In that case, the plaintiff alleged that the defendant provided it with oral representations that the hogs the defendant was selling were free of illness. *Id*. at 832. The district court ruled that the plaintiffs, experienced hog farmers, had failed to show reasonable reliance for purposes of establishing fraud, recognizing that "[e]ven to a layperson, it would seem a fantastic proposition for an experienced farmer to claim he relied on a *guarantee* that he was purchasing *disease-free* animals." *Id*. at 840. That reasoning applies with similar force under the present circumstances. It is settled that "where persons stand mentally on equal footing, and in no fiduciary relation, the law will not protect one who fails to exercise common sense and judgment." *Plymale*, 419 N.E.2d at 762. Here, Sofaer rolled the dice on an

investment that offered a more than 80% rate of return and lost. Because Sofaer did not *reasonably* rely on Mr. Laikin's statement, summary judgment is warranted.

**B.      Constructive Fraud**

Indiana courts define constructive fraud as acts from which a defendant derives an unconscionable advantage; a breach of confidence coupled with an unjust enrichment which shocks the conscience; a breach of duty which the law declares fraudulent because of a tendency to deceive, injure the public interest, or violate public or private confidence; or the making of a false statement in the context of a confidential relationship. *Abdulrahim v. Gene B. Glick Co., Inc.*, 612 F. Supp. 256, 263 (N.D. Ind.1985). Under Indiana law, the specific elements of constructive fraud are:

> (1) a duty existing by virtue of the relationship between the parties, (2) representations or omissions made in violation of that duty, (3) reliance thereon by the complaining party, (4) injury to the complaining party as a proximate result thereof, and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Dawson v. Hummer*, 649 N.E.2d 653, 661 (Ind. Ct. App. 1995) (citation omitted). Defendants contest elements (1), (2), and (3). Here, the Court has already determined that Sofaer's reliance was unreasonable as a matter of law. *See Westfield Ins. Co. v. Yaste, Zent & Rye Agency*, 806 N.E.2d 25, 31 (Ind. Ct. App. 2004) (to establish constructive fraud, "complaining party must have had a reasonable right to rely upon the statements made or omitted.").

However, even if Sofaer's reliance was reasonable, its constructive fraud claim would fail on element (1). To assert a claim of constructive fraud under Indiana law, a plaintiff must prove "the existence of a duty by virtue of a special relationship between the parties…." *Mudd v. Ford Motor Co.*, 178 Fed. Appx. 545, 547 (7th Cir. 2006) (applying Indiana law). Normally, the "special relationship" is fiduciary or confidential in nature. *Id.* (citations omitted); *see also Lycan*

17

*v. Walters*, 904 F. Supp. 884, 898 (S.D. Ind. 1995) ("For a confidential relationship to exist, it is essential that there be a dominant and a subordinate party…"). However, Indiana law recognizes that a confidential or fiduciary relationship is not essential where conditions are inherently likely to create injustice, such as "when actions or statements mislead the complaining party, and the actions or statements are of a character which *would prevent inquiry*." *McDaniel v. Shepherd*, 577 N.E.2d 239, 242 (Ind. Ct. App. 1991) (emphasis added). But where, as here, sophisticated parties sit at arm's length and one is not truly at the mercy of another, the Court is loath to impose a "special relationship."

*Remmers v. Remington Hotel Corp.*, 56 F. Supp. 2d 1046 (S.D. Ind. 1999) illustrates this point. In *Remmers*, the plaintiff, a general manager of one of the defendant's hotel properties, alleged that the defendant engaged in constructive fraud by promising him at least one year of work and firing him less than a year into his employment. *Id*. at 1057-58. The court found that the plaintiff's ability to bargain for himself, his history as a hotel general manager, and his general experience in the hotel industry and its business practices, put him in a position that would not give rise to a special relationship or place an added duty on the defendant. *Id*. at 1058. The court concluded that the defendant was not in such a position of power where it could influence the plaintiff by making promises to gain his reliance. *See id*.

The instant case is somewhat analogous. The parties had no relationship whatsoever prior to the December 17, 2007 call and Sofaer, a sophisticated entity, easily could have investigated the actual status of the deal or pressed Brightpoint or Chinatron for more details. Sofaer chose not to do so. The Court is simply not persuaded that circumstances exist that would create an injustice if the law does not find a fraud. *Id*. at 1058; s*ee also Lycan*, 904 F. Supp. at 898 (granting summary judgment on constructive fraud claim; "[a]t most, the [defendants] were

involved in an investment transaction with the Plaintiffs"); *Sees v. Bank One, Indiana, N.A.*, 839 N.E.2d 154, 164 n.8 (Ind. 2005) (Boehm, J., *concurring* in part and *dissenting* in part) (plaintiff had no claim of constructive fraud because the two parties were engaged in an ordinary arms length business transaction).

Moreover, Sofaer's key cases are inapposite. *See McDaniel*, 577 N.E.2d at 242 ("Here, the insurance company's agent advised an elderly, uneducated, and acutely disturbed woman not to hire an attorney."); *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 316-17, 324 (Ind. Ct. App. 1991) (defendant Scott was trusted financial advisor who also provided tax advice and had a working relationship with plaintiff for two years prior to events at issue; Scott referred defendant Brown to the plaintiff; "Brown claimed to be a specialist" in tax planning; and both defendants induced the plaintiff to enter a plan). Overall, because Sofaer cannot show that Defendants owed it a duty by virtue of the relationship between the parties, summary judgment is warranted on Sofaer's constructive fraud claim.

## C. Promissory Estoppel

Sofaer also pursues a promissory estoppel claim. This species of estoppel encompasses the following elements: "(1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001) (citation omitted). For two reasons, Sofaer's promissory estoppel claim suffers the same fate as its fraud claims.

### 1. Sofaer's Reliance was Unreasonable

For the reasons set out above, among others, element (3) is dispositive; Sofaer's reliance was unreasonable. *See, e.g., Garwood Packaging, Inc. v. Allen & Co., Inc.*, 378 F.3d 698, 704

(7th Cir. 2004) (applying Indiana law; affirming summary judgment on promissory estoppel claim because sophisticated principals of corporation could not have reasonably understood predictive statements by investment company as binding promises; "[u]nless blinded by optimism or desperation he *had* to know that Martin could not mean *literally* that the deal would go through 'come hell or high water,' since if Satan or a tsunami obliterated Ohio that would kill the deal.");[5] *Bowers v. Fed'n Internationale del' utomobile*, 489 F.3d 316, 324 (7th Cir. 2007) (applying Indiana law and granting motion to dismiss; "[i]f a plaintiff, given [its] background and knowledge should have known that an event was doubtful and might not occur, then it was not reasonable for [it] to rely on a defendant's 'promise' that it would."). Here, Sofaer is a sophisticated entity with prodigious expertise and experience and, under the circumstances, could not reasonably rely on a statement that a deal was "99.9% done" as of December 17, 2007, and would be completed by the end of March – over three months later. As Mr. Sofaer admitted, "there are always things that can come along to break up a potential acquisition." (Sofaer 30(b)(6) Dep. 146:22-23). And, in fact, drastic events did come to pass. From December 17, 2007 and March 31, 2008, the price of Brightpoint's stock dropped from a high of $16.26 to a low of $8.07 per share. For essentially the same reasons as set out above, the Court finds that Sofaer's reliance was not reasonable.

### 2. Mr. Laikin's Promise was not Sufficiently Definite

But even if the Court went the other way on the reasonable reliance issue, its conclusion would be the same, given that Mr. Laikin's statement was not sufficiently definite to constitute a promise for purposes of a promissory estoppel claim. Under Indiana law, "the promise relied on trigger an estoppel must be definite in the sense of being clearly a promise and not just a

---

[5] Admittedly, *Garwood* is not directly on-point, given that the representations were made by an investment company without the power to bind, whereas here they were made by a company's CEO. Nonetheless, the Court finds that the reasoning in *Garwood* is still applicable under the circumstances.

statement of intentions." *Garwood*, 378 F.3d at 702. Moreover, statements that "could not have been reasonably understood by the persons to whom they were addressed…to be promises rather than expressions of optimism and determination" do not constitute promises, and therefore do not give rise to a viable promissory estoppel claim. *Id*. at 704.

The Court need not rehash all of the reasons for this determination, but a sampling is instructive. For instance, shortly after the December 17, 2007 call, Sofaer required Mr. Arnott to sign a personal guarantee. This measure would have been altogether superfluous if the deal was actually set in stone. Similarly, the plain language of the Loan Agreement, highlighted above, indicates that Brightpoint's acquisition was not a done deal. Finally, if a promise was actually in place for a $14 million purchase price, then Chinatron's counter-offer for $6.25 million for 92.5% of Mobiltron France makes virtually no sense, and forcefully demonstrates that the deal was speculative. At bottom, the parties' conduct simply does not align with the notion that a definite promise was in place as required for a promissory estoppel claim. For this reason, too, summary judgment is appropriate.

## IV. CONCLUSION

For the reasons set out above, Defendants' Motion for Summary Judgment (Dkt. 106) is **GRANTED**. Given the Court's ruling, it need not address Defendants' damages-related arguments. A separate judgment shall accompany this entry.

SO ORDERED.

Date: ____06/10/2011____

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Richard G. Baldwin
FOLEY HOAG, LLP
rbaldwin@foleyhoag.com

A. Richard Blaiklock
LEWIS & WAGNER
rblaiklock@lewiswagner.com, jgill@lewiswagner.com, mroney@lewiswagner.com

Shawnda M. Grady
BLANK ROME, LLP
sgrady@blankrome.com

James V. Masella , III
BLANK ROME, LLP
jmasella@blankrome.com, tpryan@blankrome.com, jhanner@blankrome.com,
sgrady@blankrome.com, kreda@blankrome.com

Anthony A. Mingione
BLANK ROME, LLP
amingione@blankrome.com

Matthew L. Rea
HALL RENDER KILLIAN HEATH & LYMAN
mrea@hallrender.com, pmcfarla@hallrender.com

Robert Francis Wagner
LEWIS & WAGNER
rwagner@lewiswagner.com

Brandon F. White
FOLEY HOAG LLP
bfwhite@foleyhoag.com